No. 29,287.

The Interstate National Bank of Kansas City, Missouri, *Appellee,* v. George M. Koster, Henry Rice and The Citizens State Bank of Abilene, *Appellants.*

(292 Pac. 805.)

Opinion filed November 8, 1930.

*Charles L. Hunt* and *Frank C. Baldwin,* both of Concordia, for appellant Koster; *S. S. Smith,* of Abilene, for appellant Rice; *Arthur Hurd,* of Abilene, for appellant the Citizens State Bank of Abilene.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, Ralph W. Oman,* all of Topeka, and *William J. Scott,* of Abilene, for the appellee.

462

The opinion of the court was delivered by

BURCH, J.: The action was one by the Interstate National Bank of Kansas City, Mo., to recover on a promissory note for $5,570, given by George M. Koster on December 31, 1928, to the Southwestern Livestock and Loan Company, and payable on February 25, 1929, at the Interstate National Bank. Other relief was prayed for. The essence of the defense was payment to an agent of plain‑ tiff, authorized, or apparently authorized, to receive payment. The burden of proof rested on defendants, and the court sustained a demurrer to their evidence. Defendants appeal.

Plaintiff is a national bank of Kansas City, Mo., and dealt in what is known as cattle paper. Because of loan-limit restrictions, and to facilitate the handling of cattle paper, two subsidiary corpo‑ rations were organized, the Interstate Cattle Loan Company and the Southwestern Livestock and Loan Company. The stock of the Interstate Cattle Loan Company was owned by a trustee for the stockholders of the bank. The stock of the Southwestern Livestock and Loan Company was owned by the Interstate Cattle Loan Company. The Minneapolis National Bank was a national bank‑ ing corporation of Minneapolis, Kan.; R. C. Gafford was its presi‑ dent and managing officer. This bank had two subsidiary corpo‑ rations for the handling of cattle paper, the Central Kansas Cattle Loan Company, and the Guaranteed Finance Investment Company. The Minneapolis bank was located in a section of the state in which the cattle business was a leading industry. A cattle man needing funds to buy cattle, or otherwise finance his business, would apply to the Minneapolis bank, which in practice meant to Gafford. One of the subsidiary companies would advance the money on a note payable to the company at the bank, and the borrower would be given credit for the amount on his checking account at the bank. No cattle notes were taken in the name of the bank. They were always payable to one of the subsidiaries, and were usually secured by chattel mortgage on cattle. The note would be sold by the Minneapolis bank to the Kansas City bank at the prevailing dis‑ count rate. The Kansas City bank was the Kansas City corre‑ spondent of the Minneapolis bank. When the note was received by the Kansas City bank, instead of remitting proceeds, that bank would give credit to the Minneapolis bank, and the Minneapolis bank would debit the Kansas City bank. A discount memorandum

showing the transaction would be sent by the Kansas City bank to the Minneapolis bank. When the borrower desired to pay the note he would deposit funds in the Minneapolis bank. The Minneapolis bank would notify the Kansas City bank, and request that the Minneapolis bank be debited. The amount would be charged to the Minneapolis bank on the books of the Kansas City bank, the note would be sent by the Kansas City bank to the Minneapolis bank, and the Minneapolis bank would deliver the note, canceled, to the maker. The accounts of the two banks would be reconciled every thirty days. This general course of business between cattle men and the Minneapolis bank, and the Minneapolis bank and the Kansas City bank, was followed for ten years. The yearly transactions would amount to $100,000 or $125,000.

Defendant George M. Koster was a cattle man who did business with the Minneapolis bank. On April 14, 1928, he gave his note to the Guaranteed Finance Investment Company for $15,000, due September 24, 1928, payable at the Minneapolis bank. The note was sold to the Kansas City bank. .When the note fell due it was taken up by another note of the same amount to the Guaranteed Finance Investment Company, due November 12, 1928. The second note was sent to the Kansas City bank, and the first note was returned by the Kansas City bank to the Minneapolis bank, which delivered it to Koster. Koster deposited funds with the Minneapolis bank to pay the second note on November 19. The amount was placed to Koster's credit on the books of the Minneapolis bank, and the Minneapolis bank requested the Kansas City bank to debit the account of the Minneapolis bank. This was done, the note was returned to the Minneapolis bank, the Minneapolis bank placed a "paid" stamp on the note, and delivered the note to Koster.

Koster bought one hundred head of steers, and to obtain funds to pay part of the price gave his note for $5,500, payable to the order of the Central Kansas Cattle Loan Company. The note was dated October 15, 1928, was due December 31, 1928, and was payable at the Minneapolis bank. The note was sold to the Kansas City bank, and the usual debit and credit entries were made on the books of the two banks. The discount memorandum sent by the Kansas City bank to the Minneapolis bank showed that two notes were discounted at the same time. The memorandum read as follows:

"8% C K

DISCOUNT MEMORANDUM.

Account the Minneapolis National Bank, Ks.                    Oct. 16, 1928.

| Name. | Amount. | From. | To. | Days. | Reg. | Deeds. | Disc. | Net. |
|---|---|---|---|---|---|---|---|---|
| Geo. M. Koster..... | $5,500 | | | | | | | |
| E. H. Nelson....... | 22,000 | | | | | | | |
| | $27,500 | 10-16 | 12-31 | 76 | ... | ... | $464.44 | |

To your credit..................................———— $27,035.56"

The date of maturity of the $5,500 note arrived, and Koster desired an extension of time in which to pay it. To procure the extension, a course was pursued which, so far as the evidence discloses, had never before been adopted with respect to Koster's loans. Gafford made out a note for $5,570 for Koster to sign, not as usual to the Minneapolis subsidiary to which the original note was payable, but to the Kansas City bank's subsidiary, the Southwestern Livestock and Loan Company. The note was made payable, not as usual at the Minneapolis bank, but at the Kansas City bank. Koster had never before done business with the Southwestern Livestock and Loan Company. He had always theretofore obtained loans from one of Gafford's companies. He inquired of Gafford who the Southwestern Livestock and Loan Company was, and Gafford told him it belonged to the Kansas City bank. Koster signed the note for $5,570, which is the note sued on, and the Kansas City bank subsequently discounted it, but the usual course in such cases was not followed. Gafford did not send the note to the Kansas City bank and ask credit for it. Gafford sent it by letter dated December 31, subject to approval and acceptance. The day before the note was signed, F. B. Piatt, an inspector of security for the Kansas City bank, had inspected Koster's cattle, and Gafford offered the note on the strength of Piatt's inspection. The inspector sent in a written report, the report was satisfactory to the Kansas City bank, and on January 2, 1929, the note was accepted by the Kansas City bank. The note was discounted, the proceeds were credited to the account of the Minneapolis bank, and the Minneapolis bank was charged with the $5,500 note. A discount memorandum in the usual form, showing the transaction, was sent by the Kansas City bank to the Minneapolis bank.

Koster testified he saw the $5,500 note in the Minneapolis bank when he signed the note for $5,570. The note for $5,500 was payable at the Minneapolis bank, and might properly have been there

for collection, but Gafford testified it was not in the bank when the note for $5,570 was signed. He said the first note was returned to the Minneapolis bank after the $5,570 note was sent to Kansas City. David T. Beals was the officer of the Kansas City bank who handled the transaction for that bank. He testified to the details of the transaction as follows:

"Prior to the time we acquired the note sued on, we held a note of $5,500 signed by Geo. M. Koster. When the note sued on was received by us [the note for $5,570], we discounted the note of $5,570, credited the proceeds to the account of the Minneapolis National Bank, and on the same day charged the note of $5,500 to their account and returned it."

The discount memorandum of January 2, sent to the Minneapolis bank, was introduced in evidence, and accorded with Beals' testimony. Beals' letter of January 2 to Gafford, accepting the $5,570 note, was introduced in evidence, and it stated that the $5,500 note was returned with that letter. It is not likely that any court would permit a special finding of a jury to stand, that the note was in Minneapolis on December 31; but whether Koster's memory was at fault or not is immaterial. He testified Gafford would not let him have the $5,500 note until Gafford heard whether the $5,570 note to the Southwestern Livestock and Loan Company would be accepted. The result is, the $5,570 note was executed under circumstances not in accordance with any custom or course of business with which Koster was familiar, or, so far as the record shows, with which any other cattle man was familiar. The explanation for the change in practice was given by Beals:

"The note . . . reached here in a letter addressed to me as vice president of the Interstate National Bank. I read the letter, approved the inspection, . . . By approval of the inspection I mean that the report, which is exhibit D [introduced in evidence], showed sufficient value to justify the loan, that our inspector had been shown the cattle by the owner, and that they were in existence. . . . For some time prior to our acquisition of the note sued on, we had handled cattle paper procured through Gafford. Such paper was recently made payable to the Southwestern Livestock and Loan Company, but some time ago to the [Gafford] Central Kansas Loan Company, or the [Gafford] Guaranteed Finance Investment Company. Since we have been taking paper as the Southwestern Livestock and Loan Company we have handled it by correspondence and inspection. . . .

"Our inspection methods changed at the time we took the note sued on. Previously we took loans through the Minneapolis National Bank, and made periodical inspection of security. When we commenced to take notes pay-

able to the Southwestern Livestock and Loan Company, they were not taken until an inspection had been made and approved."

"Q. And that was true in this instance in connection with plaintiff's exhibits A and B, the note and chattel mortgage in question, by Geo. M. Koster? A. That is true. We wanted the value of the security prior to taking the loan, and we also wanted notice to the owner of the cattle that we were making the loan.

"Q. And if your investigation had been unsatisfactory, you could not accept and would not have accepted this paper? A. That is true."

Gafford's letter of December 31, sending the note to Beals, contained the following:

"December 31, 1928.

"Mr. Piatt arrived Saturday afternoon, and we made the rounds yesterday. I am sure he was well pleased with all of the loans.

"We have three loans due to-day. Kindly charge the James Berry loan of $12,000 to our account, and we would like short time extensions on the E. H. Nelson loan of $15,000, and the Geo. M. Koster loan of $5,500.

"Koster has his stuff on full feed, and will ship during February. I made the new loan for $5,570, which I think is enough to cover the discount for the extra time. . . .

"I made this new paper out on your blanks. Had you just as soon accept it this way, since Mr. Piatt's inspection? If so, that will take up all of the C. K. cattle loan paper with you."

The $5,570 note was dated December 31, 1928, was payable on February 25, 1929, and was secured by chattel mortgage on the cattle. The mortgage was dated December 31, 1928, and was sent to Kansas City with the note. As indicated, Gafford's letter to the Kansas City bank stated Koster would ship his cattle in February. Koster sold the cattle to Henry Rice, and received in payment of the price Rice's check dated January 4, 1929, on the Citizens National Bank of Abilene, for $8,000. Before selling the cattle Koster consulted Gafford, who advised him it would not be a bad idea to sell if he could make a little money on them. Koster mailed Rice's check to the Minneapolis bank, which received it on January 8, 1929, and disposed of it according to the following deposit slips:

"Minneapolis National Bank.

Minneapolis, Kan., 1/8/29.

Credit of George M. Koster:

| | |
|---|---:|
| Checks as follows | $8,000 |
| Cattle note | 5,500 |
| | $2,500 |
| Payment $2,200 note | 2,200 |
| Total | $300" |

"MINNEAPOLIS NATIONAL BANK.

MINNEAPOLIS, KAN., 1/8/29.

Credit of C. K. C. Loan Company:
    Checks as follows: Geo. Koster...................... $5,500"

The Minneapolis bank failed. It did not open on February 9. On the day before, and apparently so late in the day that the bank ledger was not written up to show what occurred, Gafford put in the bank the following deposit slip:

"MINNEAPOLIS NATIONAL BANK.

MINNEAPOLIS, KAN., 2/8/29.

Credit of Geo. M. Koster, special:
    To take up cattle note at Interstate, due 2/25/29....... $5,570"

The following was also placed on the deposit slip of January 8, which gave credit to the C. K. C. Loan Company for a George Koster check for $5,500: "Pd. 2/8/29." Finding the deposit slip of 2/8/29 in the bank, the bank examiner who took charge on February 9 simply posted it to Koster's ledger account, but not as a special deposit.

Koster mailed the Rice check to the Minneapolis bank long before his note was due. He testified he thought he was sending the money where it should go to take up his note, but there was no evidence of any direction which he gave when he sent the check with respect to how the proceeds should be applied. Gafford testified to the general practice with reference to the manner in which cattle notes were paid:

"All of the notes which were sold by the Minneapolis National Bank to the Interstate National Bank were paid by the makers by deposit of funds with the Minneapolis National Bank there, with exception of the note sued on here. The proceeds were placed in a special fund there, and we notified the Interstate to debit our account with the amount of the particular note, and that resulted in a charge against our account with the Interstate. The note which the maker had paid would be returned when it was paid, and canceled and mailed to the maker. The note would come to us from the Interstate National."

As Gafford indicated, the usual course was not followed in this instance, and the check was dealt with as shown by the deposit slips of January 8. Not until a month later, when the bank was about to suspend, did it occur to Gafford to follow the practice of placing deposits to pay notes in a special fund. What he did was to show a special deposit in the name of the depositor, Koster,

and the Kansas City bank received none of the money. There was no testimony that Koster, or any other cattle man, had ever undertaken to pay a note so long before maturity, and the facts relating to payment departed from the customary method of doing business as widely as the facts attending the giving of the note.

The Minneapolis bank did not lend a dollar of money for the Kansas City bank on cattle paper. Leaving at one side for the present the note for $5,570, all loans were made by a Gafford subsidiary which advanced the money. That was what the subsidiaries were organized for, and the loans were made to persons to whom Gafford chose to make them, on such moral and chattel security as satisfied him. The paper was then sold, and delivered to the Kansas City bank, according to regular banking practice. This practice excluded every element and all appearance of the relation of principal and agent. All paper was handled in the same way, one transaction was typical of all, and no matter how many there were, nor what the yearly total, nor how long the practice continued, the Kansas City bank simply discounted cattle paper of the Minneapolis bank.

Payment of the second $15,000 note, given September 1, 1928, was guaranteed by the payee, the Guaranteed Finance Investment Company, and by Gafford personally. Payment of the $5,500 note, given October 15, 1928, was guaranteed by the payee and by Gafford personally. What the earlier practice was relating to guaranty of payment is not disclosed, but the Kansas City bank made periodical inspections of its chattel security, and so, to an extent at least, looked after its own interests, aside from the reliance it may have placed on Gafford's judgment, integrity, and responsibility.

It is elementary law in this state that transfer of a note secured by chattel mortgage transfers the security without any formal assignment of the mortgage. Every maker of a negotiable instrument is bound to know it may be negotiated, that the transfer carries with it the chattel mortgage, and that he cannot determine whom he shall pay by the fact that he made the note to the payee, or by the fact that no assignment of the mortgage is on record. Any other rule would defeat the function of negotiable instruments. In this instance the indorsements on the $5,570 note sued on show it was at one time the property of the Federal Reserve Bank of Kansas City, and the present title of the plaintiff to the note is derived from the following indorsement:

"Pay to the order of any bank or banker,
without recourse.
FEDERAL RESERVE BANK OF KANSAS CITY.
By W. J. BAILEY, *Governor.*"

The Federal Reserve Bank rested under no obligation to notify George Koster that it held his note in order to protect any right attending ownership of the note. The free circulation of negotiable paper is not clogged by any such restriction. It required an amendment of statute to favor mortgagors of real estate and protect them in making payments to mortgagees after assignment of the mortgages.

"The situation is such that one or the other of two innocent persons must suffer loss through the misfeasance of the loan company. If it were not for the specific statute the loss would fall upon the defendant for neglecting the precaution otherwise required of him to see that his payments reached the then owner of the note. That statute, however, places the loss upon the plaintiff because of her neglect to record the assignment." (*Allen v. Waddle,* 111 Kan. 690, 693, 208 Pac. 551.)

If the Kansas City bank had been chargeable with knowledge that Gafford was deceiving his borrowers by a continuing course of conduct involving holding himself out as owner of the paper and notifying borrowers the paper was payable at his bank and making collections of principal, it would have been incumbent on the Kansas City bank to notify makers of paper which it held of its ownership, or abide the consequences of Gafford's conduct. That is all there is to the decision in the case of *Fowle v. Outcalt,* 64 Kan. 352, 67 Pac. 889, cited by counsel for Koster, except reaffirmation of the rule that one bound to pay a promissory note is not protected by payment to the payee at the place of payment without production of the paper. In this instance Gafford's long record was unmarred by any such conduct, and his clear, frank testimony given at the trial was couched in language which was incompatible with the notion that he ever appeared to act as agent for the Kansas City bank.

Koster placed on the witness stand a witness, Fred Kiser, who testified he always paid his cattle notes at the Minneapolis bank, and always received his notes when he paid them, except once when he had to wait about a week for the note. The word "payment" has a well-defined legal meaning which includes certain operative facts. Among them is delivery to the creditor, or to his agent authorized to receive payment, of money or something accepted as

an equivalent. While leaving money somewhere to be delivered to the holder of a note is spoken of colloquially as paying the note, whether payment is effected depends on the facts. In those cases in which the Minneapolis bank had Kiser's notes when he left his money there, authority on the part of the bank to receive payment was implied from possession of the paper, and no question of apparent authority was involved. In the one instance in which the bank did not have the note, Kiser left the money at the bank at his own risk. This is a settled doctrine in this state of the law of discharge of commercial paper. The doctrine is founded on sound policy, of special importance here. The cattle industry in this state has been developed to its present proportions largely on borrowed money, and protection of commercial paper, indispensable to conduct of all industry, trade, and commerce, and facilitation of the flow of commercial paper from country banks, which cannot adequately supply the financial needs of local enterprise, to city banks having command of capital seeking investment, are subjects of far greater public concern than relief of hardship in an individual case.

Proceeding from the general to the particular, there are additional reasons why the Minneapolis bank had no apparent authority to receive and hold the proceeds of the Rice check for the Kansas City bank. It is not necessary to state the circumstances again. It is perfectly true that Koster believed he was sending the money where it would go to take up his note. It is inevitable that a customer of a bank at which he keeps his checking account, and which lends him money, will depend on his banker properly to apply his funds, and particularly so when experience in that regard has proved his confidence was well placed. In this instance, however, Koster knew he had given his note and chattel mortgage directly to a subsidiary of the Kansas City bank, and Gafford was obliged to get approval of the paper by the Kansas City bank; he knew he made the note payable at the Kansas City bank; he had good reason to believe the note was in Kansas City, and it was in Kansas City; and he knew the note would not be due for forty-eight days. His dealings with the bank did not include a situation like that. He could not rely on his previous experience, and Gafford was his agent to hold his money and effect payment of his note.

The general subject is not new in this court. Its own decisions, decisions of other courts, and textbooks, have been cited to the court and have been considered by the court, time and again, and another review of the authorities is not necessary. If all the de-

cisions of all the courts were in accord, the labors of the American Law Institute would be lightened very much. In this instance the court will be guided by its own decisions.

From *Best v. Crall*, 23 Kan. 482, to *Baker v. Daugherty*, 126 Kan. 55, 266 Pac. 738, this court has consistently recognized a principle of law stated by Justice Brewer in *Best v. Crall* in the following way:

"Now a maker of a negotiable note who before its maturity pays the payee the amount thereof without a surrender of the note, does so at his peril. If the payee is no longer the holder, or entitled to receive the money, the payment in no manner discharges the paper, or prevents the real holder from recovering upon it." (p. 486.)

The principle applies generally when payment is made to a third person who is not in possession of the securities. (*Bryner v. Reynolds*, 117 Kan. 427, 431, 232 Pac. 219.) To effect discharge of the paper, the third person must be agent of the holder to receive payment, or the holder must have clothed him with such appearance of agency that the maker may rely on the appearance as safely as if authority in fact existed. Apparent authority may exist if the evidence shows the holder has permitted the third person to act as his general financial agent in a class of business which embraces payment of notes. That was the evidence in the case of *Walmer v. Redinger*, 116 Kan. 580, 227 Pac. 329. The ground of the decision in that case has been explicitly stated in *Bryner v. Reynolds*, 117 Kan. 427, 435, 232 Pac. 219, and *Baker v. Daugherty*, 126 Kan. 55, 57, 266 Pac. 738, and there should now be no misunderstanding of the decision. An appearance of agency may be knowingly suffered to exist by one charged as principal, in other ways. *Fowle v. Outcalt*, 64 Kan. 352, 67 Pac. 889, referred to above, is an example. The evidence is never the same in any two cases, and the question here is, Was the rule of *Best v. Crall* defeated by Koster's evidence?

It must be remembered the Kansas City bank must be responsible for appearance of authority of the Minneapolis bank to receive payment of notes discounted by and held by the Kansas City bank. Gafford testified for Koster concerning the practice relating to payment of cattle paper. Koster, however, contradicted Gafford, and put Fred Kiser on the witness stand to contradict Gafford. Koster testified the $5,500 note was in the Minneapolis bank when it matured and the $5,570 note was executed. Kiser testified he received his notes from the Minneapolis bank when he paid them, except on one occasion. He did not say he ever paid a note before it matured.

If the purpose of this testimony was to show general custody by the Minneapolis bank of cattle paper sold to the Kansas City bank, the testimony was utterly insufficient to warrant such an inference.

The maker of a note payable at the Minneapolis bank could stop interest by having his money at the bank to meet his note at maturity. Because of this fact the Kansas City bank was privileged to have the note at the Minneapolis bank for delivery to the maker at maturity, and no inference of apparent authority to receive payment of other notes could be drawn from exercise of the privilege. Besides that, no appearance of authority to receive payment of notes before maturity is manifested by receipt of payment of matured notes in possession of the Minneapolis bank at the time of payment.

A borrower obtains a loan of money at the bank with which he does his banking business, and afterwards deposits money in the bank to pay his note. The note has been purchased by another bank, which has possession of the paper. The money is properly applied, and the borrower receives his canceled note from his own bank. Under all the authorities, the borrower's bank was his agent to effect payment of the note. The law makes that declaration on that state of facts. The same man borrows again, and payment of his note is effected in the same way. The law is the same with respect to that transaction. The same thing occurs several times, and, under similar circumstances, with other borrowers. What, then, is the aspect of affairs? There is but one answer: No change of relation has occurred, and the bank as agent of the borrower simply appears to its customers to be trustworthy. This goes on for a good while, and finally a deposit of money with the bank that used to be the depositor's agent, does not reach the note holder, because the bank fails. What, then, is the aspect of affairs? Has the law declaring that the recipient of the money is agent of the maker of the note ceased to operate, and may a jury now find the bank has become the agent of the note holder, and do this notwithstanding the fact the note was not about to mature when the deposit was made, and had not matured when the bank failed? The court holds otherwise.

Koster introduced some testimony which has not been referred to. Koster contends the Kansas City bank admitted the Minneapolis bank was its agent for the collection of notes held by the Kansas City bank. The contention is based on the following testimony of Kiser and Mrs. Kiser:

"Mr. Hovey came there, and told me that they held a note of $13,500 against some cattle I owned, and he told me not to pay the Minneapolis National Bank, but to pay them direct. We went ahead talking about cattle loans, and he told me—I asked him how we was going to finance the cattle from this on, and since the Minneapolis National Bank had gone broke and they weren't handling their business any more, acting as their agent, and he said, 'We will have to get somebody else in Minneapolis, I suppose, to handle our business out here in this neighborhood, because we couldn't handle the business out here without somebody that knew the people out here to make our loans for us.' He mentioned something about getting somebody since the Minneapolis National Bank had gone broke." [Kiser.]

"Mr. Hovey came to our home shortly after the failure of the bank. My husband was not there. I talked with him until my husband came. Before my husband came he told me that he held this note for $15,500 and mortgage on the cattle, and said that we weren't to pay Roy Gafford or the Minneapolis National Bank. We were to pay them direct. I took down the name of the bank, the Interstate bank, and the amount of the note. Mr. Hovey wrote all those down for me. Nothing was then said about who had been handling these matters for him before. Then my husband came in. I overheard the conversation between my husband and Mr. Hovey. I can't relate all of it because I was doing my work. I heard them talking about where the cattle were, how they were going to finance this proposition, and that they would have to get some one else in that neighborhood to act as their agent or do their business, because they couldn't, didn't know the people, and couldn't come out there to do it.

"Q. To refresh your recollection, was there anything said by Mr. Hovey about who had been acting as their agent up there in looking after their paper and collecting it? A. Well, yes; he said that Roy Gafford, or the Minneapolis National Bank, had been doing their business, and now that the bank had failed they would have to have somebody else. I don't know just exactly how it was." [Mrs. Kiser.]

It will be observed that in Kiser's testimony he and not Hovey used the word "agent," and no reference was made to the subject of agency to collect notes for the Kansas City bank. It will be further observed counsel for Koster directed Mrs. Kiser's special attention to that subject, and she failed to use the important word "agent" in connection with that subject. Later the court recalled Mrs. Kiser. He told her to take her time and recall as well as she could what was said on the subject of collection of paper or making payment. She then testified as follows:

"A. He said not to pay Roy Gafford or the Minneapolis National Bank, to pay them direct.

"Q. Did he say anything else about making payments or collections; if so, what was it? A. No, not to my knowledge, only but to pay them direct, and not to pay nobody else. Our note wasn't due till March 25, I believe.

"THE COURT: That's all.

"Mr. Hunt: Just a moment.

"Q. (by Mr. Hunt) What, if anything, was said by Mr. Hovey in regard to what they had been doing with the Minneapolis National Bank before the bank failed?

"Mr. Scott: Oh, we object as incompetent, irrelevant, and immaterial.

"The Court: Overruled.

"A. Yes, he asked me—

"Q. Go ahead.

"The Court: Just tell what he said.

"A. Well, he asked me—(witness hesitates a considerable time). Well, I asked him, rather, if they had ever had any of our paper before, and he didn't know, and I went for the notes that we had previously paid at the Minneapolis National Bank, but my husband came before I looked them up.

"Q. Well, I am asking you—I will ask you if, after your husband came then, if anything was said by Mr. Hovey about the former dealing before the closing of the bank, with the Interstate National by the Minneapolis National Bank? A. No."

Timely motions were made to strike out the testimony of Kiser, and to strike out the testimony of Mrs. Kiser given before the court recalled her. The motions were denied.

It appeared that Hovey was one of the vice presidents of the bank, and the contention is the so-called admissions of agency were admissible because he was such officer. The contention is unsound. It is a matter of common knowledge that banks and other corporations frequently have several vice presidents, and that vice presidents are often, if not usually, figureheads. Aside from that, the title of vice president of a corporation indicates that the officer has no function to perform except in case of the absence, disability or death of the president. (3 Thompson on Corporations, 3d ed., p. 116.) The vice president as such has no implied powers, and can bind the corporation by his acts only if authority has been properly conferred by by-law or action of the board of directors. (Id., p. 118.) There is no presumption from the fact a person is vice president that he has authority to make admissions for the company. (*Davidge v. Guardian Trust Co.*, 203 N. Y. 331; *Parker v. Smith Lumber Co.*, 70 Ore. 41, 50.)

There was no evidence relating to the subject of what authority Hovey had to act for the Kansas City bank. The only authority he appeared to be exercising was to notify borrowers personally to pay their notes to the Kansas City bank. It is elementary law that an agent having authority to do something is not authorized to make admissions concerning what he does, unless talking about

what he does talk about is part of his job. In particular, he has no authority to indulge in reminiscences, and in the course of casual conversation make admissions for his principal. (*Case v. Pulsifer,* 79 Kan. 176, 98 Pac. 787; *Ehremann v. O. F. G. Walker Distillery,* 197 Ky. 244; *Savings Bank v. Denker,* 275 Mo. 607; *Raven Red Ash Coal Co. v. Herron,* 114 Va. 103; *Cook v. Stimson Mill Co.,* 36 Wash. 36; *Cronberg Brothers v. Johnson,* 29 Wyo. 11.)

Waiving the fact that the testimony of Kiser and Mrs. Kiser had no probative value because it was too indefinite to throw any light on the issue in the case—agency of the Minneapolis bank to collect unmatured cattle notes held by and in possession of the Kansas City bank—the testimony was inadmissible, and presumptively the court disregarded it when ruling on the demurrer to the evidence. (*Buchan v. Bolte,* 129 Kan. 747, 284 Pac. 374, and cases collated in the opinion.)

The record is filled with offers of testimony which were rejected. The offers were all abandoned at the hearing on the motion for new trial, except two. One of those which was abandoned was an offer to show division of discount on cattle notes as compensation to the Minneapolis bank for doing business as agent of the Kansas City bank. The discount memoranda introduced in evidence show just what occurred between the Kansas City bank and the Minneapolis bank, and if part of that discount had been subsequently credited to the Minneapolis bank, there would have been indisputable record evidence of the fact.

Koster filed an affidavit that, if he had been permitted, he would have testified at the trial that on January 14, 1929, some ten days after he sent the Rice check to the Minneapolis bank, Gafford told him a sufficient amount had been set aside to pay the note sued on. The testimony had no tendency to prove whom Gafford was acting for in setting aside the fund. The bank records showed what disposition of the fund had in fact been made, and agency of the Minneapolis bank to credit funds, already belonging to the Kansas City bank, back to Koster is not claimed.

Gafford filed an affidavit relating to the transactions concerning the $15,000 notes, which need not be reproduced here. There was no specific offer of evidence to which this part of Gafford's affidavit responded. The affidavit shows he desired to testify orally to what was done by correspondence and was evidenced by writings, and to give his conclusions respecting what occurred. The court permitted

plenty of oral testimony relating to the general method of handling cattle paper, including the handling of the $15,000 notes. When, however, the testimony would get down to cases, the court very properly required that the proper foundation be laid for introduction of secondary evidence. No foundation was laid, in the affidavit or out of it, for the testimony tendered in the affidavit.

Gafford's affidavit stated that, had he been permitted to do so, he would have testified at the trial that at no time previous to receipt of the Rice check had he been informed by the Kansas City bank that "it would no longer be satisfactory" for him or the Minneapolis bank "to receive payment at the Minneapolis bank for notes owned by plaintiff." This is a case of settling the whole issue in favor of Koster, and then making a negative statement about it which, with the issue determined, was inconsequential. If the Minneapolis bank was the agent of borrowers to receive money with which to pay their notes owned by the Kansas City bank, it would have been impertinent for the Kansas City bank to inform the Minneapolis bank the practice would no longer be satisfactory.

In view of the foregoing, it is not necessary to refer to other matters discussed in the briefs.

The judgment of the district court is affirmed.

HARVEY, J., not participating.