No. 29,584.

WATSON STECHER, *Appellee*, v. THE SOUTHWESTERN BELL TELEPHONE COMPANY, *Appellant*.

(295 Pac. 709.)

Opinion filed February 7, 1931.

*John Mohler,* of Topeka, for the appellant; *W. F. Lilleston,* of Wichita, of counsel.

*C. G. Yankey, John L. Gleason, Kenneth K. Cox, C. H. Brooks, Willard Brooks* and *Howard T. Fleeson,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages for personal injuries

alleged to have been sustained from a shock of lightning which entered the room in which plaintiff was sitting, because of the negligence of defendant. The jury answered special questions and returned a general verdict for plaintiff. Defendant has appealed.

Appellant's principal contention is that there is no evidence of negligence on its part, that its demurrer to plaintiff's evidence should have been sustained, and that answers to certain special questions should have been set aside for that reason. Appellant also complains of the introduction of certain evidence and of some of the instructions given by the court, and the refusal of the court to grant a new trial.

We shall first examine the record to see if there is any substantial evidence showing negligence of the defendant and to support the answers to special questions and the general verdict. The pertinent evidence in behalf of plaintiff may be summarized as follows: Plaintiff, a young unmarried man about 28 years of age, made his home with his parents and a sister on a suburban tract a few miles from Wichita. The house in which they lived faced to the west, and across the front of it was the sitting room. Just back of that was the dining room. There was an opening between these rooms a little larger than for a double door. To the south of the dining room was a screened-in porch. About midway of the partition between the dining room and the porch was a window, and to the west of that a door. Back of the dining room was a kitchen, and to the south of that was a storage room used at times for wood and coal. When the family moved to the place in 1915 there was a telephone in the house, the telephone instrument being on the dining-room wall just west of the window in the partition between the dining room and the porch. At that time the lead-in wires of the telephone came into the porch and were grounded to a rod just west of the window in the porch, which extended down through the floor of the porch into the ground. About a year after the family moved to the place the telephone installation was changed so that the lead-in wires came to the south side of the storage room about midway east and west, inside of which room and on the south wall the protector was installed. The telephone wires were strung from the protector west to the corner of the storage room, then north in the storage room to a place in the partition opposite to the south side of the dining room, west through that partition, and along the top of the window to the

west side thereof and down to the telephone instrument, which was placed lower than it had been and so a person could use it while sitting in a chair. That arrangement of the installation of the telephone has continued since it was made. At the time this change was made the old rod on the porch, used to ground the telephone, was left in place and a piece of wire was left tied to it, extending up to about the top of the window, where it had been cut in two. Plaintiff had spent much of his time looking after an orchard on the place and a chicken business there conducted, but a few months prior to May 20, 1927, had been a traveling salesman for a tobacco company, a business his father had been engaged in for many years. On May 20, 1927, plaintiff was operated on at a hospital for appendicitis and remained at the hospital nineteen days, and went home and was recuperating, and planned soon to return to his work. About 5:30 o'clock in the afternoon of June 16, 1927, plaintiff was sitting in a wooden rocking chair in the opening between the dining room and sitting room and facing the dining-room table. The family had had dinner, his father had gone to the barn, and his mother had stepped out of the dining room. He testified that a severe electrical storm came up, "there was a real loud clap of thunder and lightning, and, as the lightning hit, why, it sent flashes of fire about six or seven feet out from the telephone, big flashes, and as each flash came from the telephone, it felt as though someone had a dull knife just trying to cut on my insides. . . . I was sitting right about in the middle of the partition, about seven feet from the phone, when the lightning hit. . . . I saw the lightning flashes come from the telephone."

"Do you know whether these flashes struck you? A. I couldn't say as to that."

He called to his mother. She came, put him to bed, where he remained about two days, and later had to go to the hospital for treatment. There was much other evidence with respect to the effect of this shock upon plaintiff, and his condition up to the time of the trial. We need not detail that evidence, for the principal question here presented is whether plaintiff can recover at all, and if so, whether a new trial should be granted because of trial errors. Plaintiff did not see the room in which the telephone was, to observe it, until after the telephone was repaired. When he did observe it the curtain covering the window was scorched black and there was

a hole burned through the wall of the house. That hole was about three feet above the telephone instrument. This hole on the inside of the dining room was about as big around as a quarter, and "on the inside is burned around just like real fire had gone through."

"Q. And no burn on the outside? A. Just a heavy blast, or charge, right against the wall.

"Q. Was it burned on the outside? A. Not that I know of.

"Q. The hole was bigger on the inside than on the outside, wasn't it? A. Yes, sir."

This hole was a short distance, perhaps an inch, from the telephone wires. The telephone wires were burned in two. The next day, or within a few days after the lightning struck the telephone, a man came out to repair it.

"Q. What did he do, if anything? A. He went into the room where the arrestor was, and made some repairs there, and spliced a wire right above the telephone, where it was burned in two. . . .

"Q. Now, was anything said between you and him, at the time that he came out? . . . [This was objected to unless it was shown what his authority was, and for the further reason that his authority had not yet been shown, he might not bind the company at all.] A. I asked him what was wrong, and he said there was something wrong with the fuses, and then something about some plates that weren't right.

"Q. What did he say? A. He said there was something wrong with it.

"Q. Did he say anything else? A. No, sir; because I didn't stay in there all the time that he was there."

Later a change was made; they put on a new receiver and a new arrestor.

"Q. Did you watch what he did out there? A. Oh, I noticed he said something about some fuses, and some plates, not being right; and that's all I noticed; only, later on, when he repaired and spliced the wire where it had been burned in two."

After that was done the telephone worked. It had worked on June 16, before the lightning struck. So far as plaintiff knew, the repair man did not replace any of the inside or outside wiring. The inside wire has never been changed.

"Q. Have you ever examined that wire? A. I only noticed that the wiring, as it comes from the arrestor to the telephone, where it goes through the hole in the wall above the sill, there is no tubing whatever around that wire as it goes through the wall of the house. . . . It goes through the wall there, through the wood. . . .

"Q. You didn't see any evidence of wood being burned around there, did you? A. No, sir; the only evidence I noticed was that there wasn't a tube through the wall of the house.

"Q. You don't know whether lightning made that hole going in, or coming out? A. No, I don't know; all I know, it came through the telephone, and there was a flash before the telephone.

"Q. I mean, when it came through the house; you don't know where it came into the house first? A. No, sir."

The flashes were large and flashed out six or seven feet from the telephone straight out from it, from the mouthpiece and above. Where the hole was burned through the wall of the house it touched the ground wire on the outside. The ground wire extended above the hole a foot and a half or two feet, which would be to about the top of the window.

"Q. You didn't see any ball of fire rolling in the top of that window along the wire coming in? A. No, sir."

A month or two after June 16, 1927, the lightning struck a tree in the yard of plaintiff's home and put the telephone out of order. The repair man who came out at that time put some copper wires by the side of the fuses on the protector.

"Q. Did this repair man do anything with the protector, the first one? A. He took the fuses away, and he said there was something wrong with the plates; and I don't know what he did with the plates.

"Q. Did he replace anything? A. I didn't see him, to see what he did to the protector."

On June 16, 1927, there was a washbowl in the storeroom with a drain pipe and a water pipe. The water pipe ran to a hydrant in the yard. There was a ground wire from the protector connected with the water pipe. Plaintiff did not know whether it was actually connected on that date or not.

On being recalled plaintiff said he had not previously testified to all the repair man said. He was asked to give the additional statement. (This was objected to for the reason that the ground had been previously covered.) He answered:

"He said there was something missing.

"Q. Referring to what? A. I don't know what it was that he referred to; but he said something was missing; that's all I know."

Plaintiff's father, Leopold Stecher, testified that at the time of the incident which formed the basis of this action he was walking from the house to the barn. He was asked to state what occurred, and said:

"Well, sir, the lightning struck the house; and it jarred me at the same time. As I walked past the house my wife was standing on the back porch,

and I said, 'The lightning must have hit the house;' and she said, 'I will go in.' . . .

"Q. Now, Mr. Stecher, with reference to the lightning, did you see any lightning?  A. I saw some lightning come out of the porch, on the side I was on.

"Q. Was that the only lightning you saw?  A. No.

"Q. Did you see the lightning come from the house?  A. I seen the lightning coming through the porch from the house. . . . As I stated before, I saw the lightning coming through the porch from the house, leading from the house out to the porch.

"Q. That's all you saw?  A. That's all I saw, so far as lightning is concerned, on the outside. . . . I saw the lightning come out of the porch.

"Q. Now, did you observe the wall about the telephone, when you came in?  A. Well, the curtain was partly burned, at a spot, say, about the size of my two hands, where it burned the curtains, and a hole through the wall where the lightning had come through; it followed the telephone down."

With respect to the wires above the telephone instrument, he was asked to place their location with reference to the window.

"A. They followed right down by the side of the window, down to the phone, to where the lightning came in through the wall of the house, and followed that wire down, and looked like it burned the wire in two, almost, right there where it burned the curtain."

He did not see the lightning come down and hit the house. Mrs. Leopold Stecher, at the time of the incident in question, was standing in the back room of the house, "and just then such a peal of thunder, and just as it crashed my husband was passing the corner of the house. . . . Finally I looked at the window, and saw the condition the window was in, and the curtain; it was almost burned through, although not clear through; it was a lace curtain."

"Q. Where is the lace curtain with reference to the telephone wire?  A. Right beside the phone, on the east side.

"Q. Did you notice anything with reference to the wall?  A. Yes; it was all blackened, and a hole in it at the same time.

"Q. Now, has there been any change in that condition of that wall, since the accident?  A. Well, we had the repair man come out and fix it.

"Q. What did he fix?  A. Well, he wrapped the wire near the hole burned through the wall; it was all burned off; it was burned in two, if I remember. . . .

"Q. Did you have any conversation with him?  A. Well, none to speak of, at all, when he came in."

She thought the repair man came out the next Monday.

"Q. Did you have a conversation with him, at that time?  A. Well, I don't remember much; I know, when he came in, I saw him wrapping the wires; I know that.

"Q. Yes? A. When he was through with that, I walked into the other room with him.

"Q. Yes? A. And he said something—he said, 'It is a wonder something hadn't happened before this'; that's all I heard him say; that's what he said."

Defendant's objection to this last question, that it was incompetent, irrelevant and immaterial and indefinite, was overruled.

William Kimmons, an employee of defendant, on August 22, 1929, went to the Stecher home to change the batteries in the telephone and while there changed the receiver and the protector on the telephone. His report reads:

"Changed receiver; the other one was old style. Changed to 58AP protector; old style removed."

It was his instructions to change all the equipment that was nonstandard to the standard type.

"These changes are made, due to that there is nonstandard equipment in the field we must take out, although it is just as good as the equipment we are putting in."

There was a general order to change these and replace them where found. The witness did not know the reason for the order. The defendant company did not have parts at Wichita for the older type equipment.

Chester L. Harrington, called by plaintiff as an expert on telephone equipment and installation, and having qualified as such, testified that—

"A protector is a device manufactured by the Western Electric Company, for all telephone companies, to protect property and the instrument from lightning and electricity."

The protector has a place for the attachment of the lead-in wires from the poles which lead to the telephone instrument; also a place for an attachment of a ground wire to carry off excess charges of electricity. There are two fuses, one on each side, which burn out if a foreign electric current comes in on the wire. These fuses are not a protection against as strong a current as would be produced by lightning, which would jump over the fuses and go to the ground wire. There is a metal cap inclosing carbon blocks.

"These carbon blocks are your protection from lightning. The lightning strikes it, arcs these [carbon blocks] together, the same as the old incandescent arc lights, and throws it into the ground. Lightning takes the most direct route to the ground."

This protective device should be placed where it is easy to get

to for repairs and replacing of the carbon blocks, and also where there would be no accumulation of dust or moisture. It would be best not to put it in a coal shed. The ground wire from the protector, when the home is a modern one, is grounded through the water pipe. The witness had examined the telephone in the Stecher home and saw, above the telephone a short distance, a hole that the lightning burned, and had heard the testimony about the old ground rod on the opposite side of the wall from the telephone which had been left there from a former telephone installation, and, assuming that the lightning came into the house over the telephone wires, he was asked whether that lightning would be apt to jump from the telephone wires through the wall to the old ground.

"A. Well, lightning is going to take the most direct course to the ground, and, if the protector didn't work, it would be possible for it to run in on the telephone line; yes, sir.

"Q. And would it jump out to that old ground? A. It probably would, seeking the nearest ground."

A protector similar to the one in use on June 16, 1927, marked "Exhibit 1," was shown the witness and he was asked if that was the latest approved appliance for protecting life and property from electricity and lightning carried on telephone lines at that time, and answered: "No, sir; it is not the latest." He was then shown plaintiff's exhibit 2, which was the protective device installed by Kimmons on August 22, 1929, and stated that was the latest approved design.

"Q. What is the difference between the old protector and the new protector? A. Well, it is more modern, and new, if that means anything."

The new one is not so liable to accumulate dust as the old one. The holders of the fuse on the old type are clamped on, while in the new device they are screwed up with taps. The old one has a porcelain base or plates, and the new one asbestos.

"Q. Well, now, point out wherein the old one differs. A. That is pretty hard to say."

In the old style there is a mica background on the mounting of the carbon blocks. The newer one has no mica background. With the mica background the mounting might not be seated tight. If they are screwed up tight they have less chance of getting dust in. Dust and dampness would cause a short circuit.

The fuses on the protector are not designed to protect against

lightning—the lightning current—but to protect against a current that might become crossed with the 110 electric light drop going into an ordinary house. "Those fuses wouldn't mean anything to lightning. However, if lightning would go through it, it would blow up like firecrackers." On the inside of the fuse is a little soft malleable wire that will easily burn. The rest of the fuse is simply a covering for the wire and is put on there to keep fire from spreading if the wire should burn. The two protectors are the same in principle, so far as the carbon blocks are concerned. These carbon blocks are set a short distance apart. The ordinary electric current for a telephone will not jump from one to the other. A current such as lightning would jump from one to the other and arcs them together into one piece; in other words, welds them together. When the current jumps, this welds the carbons together; even the ordinary telephone current is grounded and the telephone is put out of working order until the old carbons are taken out and new ones put in. Both the old-style protector and the new-style protector are, with respect to the carbon blocks, constructed in the same way and operated on the same principle. "They are identical in operation." If dust or moisture should get inside of the cap where the carbon blocks are it would tend to shorten the air space between the carbon blocks, would make the telephone noisy, and perhaps make it easier for the electric current to jump from one carbon block to the other, and cause the instrument to be a greater protection against such excess charge of electricity as is produced by lightning. Perhaps if the gap between the carbons has narrowed just a little by dust and moisture a part of the current might jump across and some of it get into the telephone. The witness had never studied the measure of the electric current of lightning and did not know what voltage it would require to break down the insulation provided for the wall of the house.

"Q. If there was anything missing in this protective device, state whether it would operate. A. Well, the phone wouldn't work—it is according to what was missing.

"Q. If there was something missing in this protective device, say the carbon block, or something like that, would it function properly? A. No, sir."

The witness thought the older style protector would be more likely to corrode. He didn't know whether dust between the carbon blocks would keep them from fusing or not. The older protective device would be more apt to be out of order. In 1920 the new type

protector was being installed. The cap on the new-style protector has printed on it: "Patented in U. S. A., August 11, 1914."

In this résumé of plaintiff's evidence pertaining to defendant's liability, what is there to establish negligence of defendant, or that the lightning came into the house over the telephone wires? In discussing this we shall pass for the present—to be treated later— the remarks attributed by the witnesses to the repair man. This evidence discloses that the only marks left by the lightning on the house, or on the telephone wires and equipment, are the hole through the wall, the telephone wires burned in two near the hole, and the window curtain blackened near the hole. There is no evidence that the telephone wires leading into the house to the protector, or the wire leading from the protector to the telephone instrument, showed any evidence of the lightning except where they were burned in two near the hole. Lightning carrying an electric charge sufficient to burn wires in two, at the only place it was known to touch them, certainly would have left some evidence of injury to those wires, or the insulation on them, at other places, if it had passed over them. There was no evidence of such injury. Those wires were still in use at the time of the trial of this case. It would seem, also, that where the unprotected wire passed through a partition next to a board there would have been some evidence of burn there. There was no such evidence. Had this lightning current passed through the protector the evidence discloses that at least two things would have happened: (1) The fuses would have been blown up like "firecrackers," and (2) the carbon would have been welded together. There is no evidence that either of those things happened.

Plaintiff's expert witness gave testimony on the proper method of installing a telephone and pointed out the differences between the old-style protector and the newer one. No defect of installation of the telephone in question was pointed out that could have had any bearing on the injury which formed the basis of this action. The differences between the two protectors were differences in their design, which did not affect their operation. Both operated on the same principle. The specific parts of the devices designed to protect against lightning were the same in the two instruments. If the new device were a better protector against lightning, the use of the old one might show a negligence of defendant. But that is not the evidence here. Defendant was not required to use the newer device simply because it was newer. If the old device furnished

as good protection as the newer one defendant had its option as to which it should use. The evidence in this case does not support a charge of negligence in using the older device.

Whether the lightning came in or went out of the dining room through the hole in the wall is not at all clear from the evidence. Plaintiff's father testified, "the lightning struck the house;" that he turned and saw the lightning "come from the porch;" and, after he went in the dining room, of seeing "where the lightning came in through the wall." Plaintiff was positive the flashes of lightning came into the dining room as much as five or six feet from the telephone instrument—large flashes, several of them. The hole through the wall was larger on the inside of the dining room than on the outside. On the inside it was round and appeared to have been burned. On the outside it had the appearance of "a heavy blast, or charge, right against the wall." But unless defendant is responsible for the lightning being in the house, perhaps it is not material whether it came in or went out through the hole in the wall.

Let us now examine the remarks of the repair man and their effect. We first note that the only authority the evidence tended to show he had was that of repair man, which we take to mean a man to make repairs. This was shown only by the fact that he came to the place in a car on the side of which was painted the name and symbol of the defendant company, and the fact that he did make repairs—he spliced the wires which had been burned in two near the hole in the wall. No attempt was made to show that he had any other duty or authority than to make repairs, and certainly there was no showing that he was authorized while there to talk either for or against the company by which he was employed. In the absence of such a showing his remarks should not bind his principal. (*Interstate National Bank v. Koster,* 131 Kan. 461, 474, 292 Pac. 805; *Flanigan v. Railway Co.,* 108 Kan. 133, 193 Pac. 1077; *Johnson v. McLain,* 79 Kan. 423, 425, 100 Pac. 52; *Railway Co. v. Burks,* 78 Kan. 515, 96 Pac. 950; *Walker v. O'Connell,* 59 Kan. 306, 52 Pac. 894; *Railroad Co. v. Cattle Co.,* 59 Kan. 111, 115, 52 Pac. 71; *A., T. & S. F. Rld. Co. v. Wilkinson,* 55 Kan. 83, 39 Pac. 1043; *Mo. Pac. Rly. Co. v. Johnson,* 55 Kan. 344, 40 Pac. 641; *Dodge v. Childs,* 38 Kan. 526, 16 Pac. 815; *St. L. & S. F. Rly. Co. v. Weaver,* 35 Kan. 412, 11 Pac. 408; *C. B. U. P. Rld. Co. v. Butman,* 22 Kan. 639.)

But let us examine the remarks made by the repair man and see

if they really establish any negligence of defendant, assuming, for the moment, that he had authority to make them. To plaintiff's mother he said, in substance: "It is a wonder something hadn't happened before." This remark was not made while he was doing any repair work. He had finished splicing the wires where they had been burned and he and the witness had walked into another room. There is nothing to indicate to what the remark referred—whether to the lightning, or to some other matter; or, if it referred to the lightning, whether it referred to the telephone equipment and the manner of its installation, or to something entirely apart from that. It would be pure speculation to say that the remark was an admission of negligence on behalf of defendant. The plaintiff testified that he asked the repair man what was wrong, and he said there was something wrong with the fuses, and then something about some plates that weren't right. At another place in his testimony he said the repair man took the fuses away and said there was something wrong with the plates. Plaintiff did not know that he replaced anything. He was not where he could see what the repair man did to the protector. On being recalled, plaintiff remembered that the repair man said "there was something missing." Plaintiff did not know to what that remark referred. Of course, neither the jury nor trial court knew to what that remark referred. Plaintiff's expert said that how something missing from the protector would affect its operation would depend on what part was missing. He did say that something missing in the protector would cause it not to function properly. Naturally, in what respect it would not function properly would depend on what was missing. There might be any of several things not functioning properly about the protector which would not interfere in the least with its efficiency as a protector against lightning. The fuses meant nothing to lightning, and if there was something wrong with them, or if they were absent from the protector, that fact would not affect its efficiency as a protector against lightning. In fact the appellee argues, in his reply brief, that if it were error to admit this evidence it was immaterial, for the reason that the fuses were not the part of the device which was designed to and which did afford protection against lightning. The evidence referred to the porcelain base of the device as the plates. It is difficult to see what could have been wrong with that unless it had been cracked or broken, and there was no evidence of that. The result is that there is nothing in any of the remarks

attributed to the repair man to show that there was anything wrong with this protector that would interfere with its efficiency as a lightning arrestor.

The jury was forced to pure speculation and conjecture as to the negligence of the defendant. This will not support a finding of negligence.

Appellee cites and relies largely on the case of *Southwestern Bell Tel. Co. v. McAdoo,* 178 Ark. 111, in which he says that the facts tending to show negligence of defendant, which the court held sufficient to go to the jury, were very similar to the case at bar. An examination of that case does not support that view. In that case there was positive evidence that the protector was not grounded; the telephone fuses were burned out, and the batteries were burned out. There is no evidence of any of those things in this case. Here the evidence is that the protector was grounded to a water pipe in the ground. It is true plaintiff said he did not know whether the ground wire was connected on the day of the lightning, but that is far short of proof that it was not connected. Here there is no evidence that the fuses, or the batteries, were destroyed. In that case there was evidence that if the protector were not grounded the lightning would destroy the fuses and pass on to the telephone. The fact that the fuses and batteries were blown up made substantial evidence that the lightning passed through the protector. The fact that the protector had not been grounded when it was installed, nor until after the lightning which caused the damage, established negligence of defendant in that respect. So the cases are quite unlike.

Appellee argues that negligence may be shown by circumstantial evidence. It is possible, of course, for that to be done. But negligence is never assumed, and must be shown by some kind of evidence, and where there is no direct evidence of negligence, and circumstantial evidence is relied upon wholly, and such evidence is fully as consistent, or more so, with the lack of negligence of defendant as it is with such negligence, the circumstances cannot be said to establish negligence. Here the evidence in behalf of plaintiff was that the telephone was properly installed with a lightning protector device of the type which had been generally used for many .years, and which was identical in principle and operation with a later design of a similar device; that this protector was properly grounded; and there is a lack of any evidence that an excessive

charge of electricity, such as would be produced by lightning, was on the telephone wires leading to the house, or on the protector, or on the wires leading from the protector to the telephone, except at the one place where the lightning came in or went out through the wall of the house. With the evidence in this situation we are forced to conclude that there was no substantial evidence that the lightning came into the house over the telephone wires, or that defendant was negligent in any respect which caused injury to plaintiff. Defendant's demurrer to plaintiff's evidence should have been sustained.

Appellant complains of errors in the instructions, the refusal of the court to set aside the answers to special questions because they were not sustained by evidence, and the failure of the court to grant a new trial. Some of these points are well taken, but in view of the conclusion we have reached it is not necessary to discuss them at length.

The judgment of the court below will be reversed, with directions to sustain the demurrer to plaintiff's evidence and to enter judgment for defendant.